IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALLSTATE INSURANCE COMPANY, an
Illinois Corporation,

      Plaintiff,

   v.

ANDREW PIRA, RICHARD PIRA, and
ALEXANDER YIN,

      Defendants.

No. C 11-3511 CW

ORDER GRANTING
ALLSTATE'S MOTION
FOR SUMMARY
JUDGMENT (Docket
No. 77) AND
DENYING YIN'S
CROSS-MOTION FOR
SUMMARY JUDGMENT
(Docket No. 91)

AND ALL RELATED COUNTERCLAIMS
AND CROSS-CLAIMS

_____/

Plaintiff and Counter-Defendant Allstate Insurance Company
and Defendant and Counter-Plaintiff Alexander Yin move for summary
judgment on their claims against one another.  They dispute
whether Allstate is responsible for satisfying any portion of the
judgment that Yin won against Defendants Richard and Andrew Pira
in a state court action.[1]  Having considered the papers filed by
the parties and their arguments at the hearing on this matter, the
Court GRANTS Allstate's motion for summary judgment and DENIES
Yin's cross-motion.

BACKGROUND

I.   The Underlying Action

In the complaint in the underlying action, Yin alleged that
on or about March 17, 2005, at approximately 11:30 p.m., he was
standing in a rural area in or near the city of Locke in the

_____

[1] Default has been entered against the Piras in the instant
case.  Docket Nos. 11, 18.

county of Sacramento when Andrew Pira and some unknown other

individuals "knowingly and maliciously fired a handgun" at Yin

"several times, causing a bullet to strike" him.  Vannucci Decl.

¶ 2, Docket No. 90, Ex. 1 (State Court Compl.) ¶¶ 5, 6.  Yin

alleged that he was injured as a result of these actions and that

both Andrew, who was a minor at the time, and his father, Richard

Pira, were legally responsible for these injuries.  Id. at ¶¶ 2,

11-41.

   In the police report for the March 17, 2005 incident, the

investigating officer wrote that Yin, an eighteen-year-old, told

the officer that Andrew owed him $10,000 for a gambling debt, and

that, on the night in question, Andrew drove him and several of

Andrew's friends somewhere ostensibly to get the money for Yin,

but instead took him to a field and shot him, saying "I aint

paying you shit."  Allstate's First Request for Judicial Notice

(1RJN), Docket No. 78, Ex. B, 9.[2]  According to the police report,

one bullet hit Yin in the wrist and a second missed him, before he

was able to escape from Andrew and the others.  Id. at 4.

   The state court trial began on June 7, 2011.  Compl. ¶ 11;

Answer ¶ 11.  At trial, Yin's attorney, who also represents him in

the instant case, argued that, although Andrew did not actually

fire the gun at Yin, he arranged the shooting after Yin "kept

bugging" him about the money he owed him.  1RJN, Ex. C, 1007:2-15,

2077:5-14, 2083:9-11.  He contended that Andrew contacted his

---

[2] With its motion and reply, Allstate requests that the Court
to take judicial notice of a number of documents.  Yin does not
oppose the requests.  The Court grants Allstate's unopposed
request.

United States District Court
For the Northern District of California

cousins and hatched a plot with them "to get Alex to come with them on a ride . . . and shoot him and get rid of the body." Id. Yin's counsel argued that Richard was liable for Andrew's actions because he had sole custody and control of Andrew, knew that Andrew had habits and tendencies that posed a danger to others and failed to supervise him. Id. at 2071:17-2072:13, 2077:2-4.

On July 7, 2011, the jury returned a series of special verdicts in favor of Yin. Vannucci Decl. ¶ 8, Ex. 7; 1RJN, Ex. D. The jury found Andrew liable for both intentional battery and negligence. Id. The jury also found Richard liable on two counts. Id. First, they found Richard liable for negligence for failing to exercise reasonable care to prevent Andrew's conduct or take reasonable precautions to prevent harm to others. Id. Second, they found Richard statutorily liable for Andrew's willful misconduct toward Yin. Id. In making the latter finding, the jury found that Andrew had engaged in willful misconduct. Id. The jury also found that Andrew engaged "in the conduct with malice, oppression, or fraud," and awarded Yin punitive damages against Andrew. Id.

On February 16, 2012, after a hearing, the trial court entered an amended judgment, reducing the jury's damages award against the Piras. Vannucci Decl. ¶ 9, Ex. 8; 1RJN, Ex. E. Under the amended judgment, Andrew and Richard are jointly and severally liable for damages of $174,969.92, Andrew is severally liable for damages of $591,000 and for $100,000 in punitive damages, and Richard is severally liable for damages of $394,000. Id. Thus, the total award against Richard is $568,969.92 and the total award against Andrew is $865,969.92. Id.

United States District Court
For the Northern District of California

3

1    Yin asked Allstate to satisfy the judgment and it did not.

2    1ACC ¶ 19; Answer to 1ACC ¶ 19.

3    II.  The Insurance Policies

4         Erlinda Ipac is the mother of Richard and the grandmother of

5    Andrew.  Barnes Decl., Ex. A, 12:15-16, 13:7-9.  On March 17,

6    2005, Erlinda was the sole named insured on the policy

7    declarations for two separate, but similar, homeowners' insurance

8    policies with Allstate.  Davis Decl., Ex. A, AIC00005 (Peabody

9    policy); Davis Decl., Ex. B, AIC00077 (Westgate policy).  One

10   policy listed the location of the property insured as 64 Westgate

11   Drive in San Francisco, California and had family liability

12   coverage of $100,000 for each occurrence.  Davis Decl., Ex. B,

13   AIC0077-78.  The premium period for the Westgate policy was from

14   May 17, 2004 to May 17, 2005.  <u>Id.</u> at AIC00077.  The other policy

15   listed the location of the property insured as 258-260 Peabody

16   Street in San Francisco, California and had family liability

17   protection for $1,000,000 for each occurrence.  Davis Decl., Ex.

18   A, AIC00005-06.  The premium period for the Peabody policy was

19   from January 13, 2005 to January 13, 2006.  <u>Id.</u> at AIC00005.

20        Section II, Coverage X of the policies set forth the terms

21   for the coverage for family liability protection.  Davis Decl.,

22   Ex. A, AIC00048; Davis Decl., Ex. B, AIC00113.  The coverage

23   clauses state,

24        Subject to the terms, conditions and limitations of this
          policy, <u>Allstate</u> will pay damages which an <u>insured</u>
25        <u>person</u> becomes legally obligated to pay because of
          <u>bodily injury</u> or <u>property damage</u> arising from an
26        <u>occurrence</u> to which this policy applies, and is covered
          by this part of the policy.

27

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   Davis Decl., Ex. A, AIC00048; Davis Decl., Ex. B, AIC00113
2   (emphasis in bold in original).  The policies define "insured
3   person(s)" to mean "you and, if a resident of your household:
4   a) any relative; and b) any dependent person in your care."  Davis
5   Decl., Ex. A, AIC00031; Davis Decl., Ex. B, AIC00096 (emphasis in
6   bold in original).  The policies define "you" and "your" to mean
7   "the person named on the Policy Declarations as the insured and
8   that person's resident spouse."  Davis Decl., Ex. A, AIC00031;
9   Davis Decl., Ex. B, AIC00096.

10      The policies define "occurrence" to mean "an accident,
11  including continuous or repeated exposure to substantially the
12  same general harmful conditions during the policy period,
13  resulting in bodily injury or property damage."  Davis Decl., Ex.
14  A, AIC00032; Davis Decl., Ex. B, AIC00097 (emphasis in bold in
15  original).

16      Both policies define "residence premises" to mean "the
17  dwelling, other structures and land located at the address stated
18  on the Policy Declarations."  Id. (emphasis in bold in original).
19  They also define "insured premises" to mean "a) the residence
20  premises . . ."  Id. (emphasis in bold in original).

21      In both policies, Exclusion 1 to Coverage X states in
22  relevant part,

23      We do not cover any bodily injury or property damage
24      intended by, or which may reasonably be expected to
        result from the intentional or criminal acts or
25      omissions of, any insured person. . . .

26      This exclusion applies regardless of whether or not such
        insured person is actually charged with, or convicted of
27      a crime.

28

5

Davis Decl., Ex. A, AIC00048; Davis Decl., Ex. B, AIC00113 (emphasis in bold in original).

"In addition, Cal. Ins. Code § 533 (West 1972) provides in relevant part: 'an insurer is not liable for a loss caused by the willful act of the insured.' Under California law, section 533 is a part of every insurance contract and is equivalent to an exclusionary clause in the contract itself." Allstate Ins. Co. v. Gilbert, 852 F.2d 449, 451 (9th Cir. 1988) (citations omitted).

III. Allstate's Reservation of Rights

After Andrew and Richard Pira tendered defense of Yin's suit to Allstate under the policies, Allstate sent them a letter dated August 6, 2009, stating that it would pay for the defense subject to a reservation of rights. Dillard Decl. ¶ 4, Ex. A. The letter was addressed to "Richard and Andrew Pira" and identified Richard as the "Insured" in the heading. Id. at 1. The letter stated that,

> According to our records, Allstate insured Richard Pira and Erlinda Ipac from January 13, 2004 to August 11, 2006 under Deluxe Homeowners Policy number 9 14 083772. That policy insured the home at 254 Peabody Street in San Francisco . . .

Id. at 1. The letter further explained "five principal grounds" on which Allstate reserved its right to dispute coverage, including that

> we have been unable to determine who lived with whom (or where) at the time of the incidents alleged in the complaint. Accordingly, Allstate must reserve its rights to disclaim coverage under either or both of its policies for any individual who did not qualify as an "insured person" on the dates of the two incidents alleged in the complaint.

1   Id. at 3-4.  Allstate also stated that it "reserves the right to

2   raise additional coverage defenses at any time, whether based on

3   newly discovered facts or otherwise."  Id. at 5.

4   IV.  Ownership of the Properties and Residence of the Piras

5         In 1968, Erlinda moved to San Francisco, California with her

6   son, Richard, who was six years old at the time.  Barnes Decl.

7   ¶ 2, Docket No. 79, Ex. A, 12:5-10; Barnes Decl. ¶ 3, Ex. B,

8   12:15-17.  Erlinda and her then-husband purchased the Westgate

9   property sometime in the 1970s and they still own it today.

10  Barnes Decl. ¶ 3, Ex. B, 12:24-13:10.  She has lived at the

11  Westgate house continuously since she purchased it.  Id. at 13:18-

12  20.

13        Richard lived in the Westgate house throughout most of his

14  childhood.  Id. at 18:15-21.  He married at some point in the

15  1980s and his son, Andrew, was born on May 29, 1987.  Id. at

16  13:21-23; Allstate's 2nd Request for Judicial Notice (2RJN),

17  Docket No. 94, Ex. B, 11:21-22.  Thereafter, Richard and his

18  family moved out of the Westgate house.  Barnes Decl. ¶ 3, Ex. B,

19  18:17-21.  On January 24, 1994, Richard and his wife divorced and

20  Richard was granted custody of Andrew.  1RJN, Ex. F.

21        Erlinda and Richard, along with two others, became the owners

22  of the Peabody property in October 2000.  1RJN, Ex. G, 1.  At the

23  time of the March 2005 shooting, and during the relevant premium

24  period for the Peabody policy, Erlinda and Richard were co-owners

25  of the Peabody property.  Id. at 11-19.

26        During the time that Richard was an owner of the Peabody

27  property, including when the shooting took place, he lived there

28  by himself and it was his full-time residence.  Barnes Decl. ¶ 2,

United States District Court
For the Northern District of California

7

Ex. A, 31:5-14.  Erlinda testified that she only visited the Peabody property on one occasion.  Barnes Decl. ¶ 3, Ex. B, 21:16-21.  She also stated that, while Richard was an owner of the Peabody property, he never stayed at her house or spent the night there.  Id. at 22:7-16.

In 2006, the Peabody property was sold to a third party. 1RJN, Ex. G, 21-24.  Richard moved back into the Westgate house to live with his mother within several years before his deposition in December 2012.  Vannucci Decl. ¶ 7, Ex. 6, 20:1-3; Barnes Decl. ¶ 3, Ex. B, 22:2-4.

V.   Procedural History

On July 18, 2011, shortly after the jury returned the verdicts against the Piras, Allstate initiated this action against the Piras and Yin.  Compl., Docket No. 1.  In its first and third causes of action, asserted against the Piras only, Allstate seeks a declaration that it had no duty to defend them in the state court action and seeks reimbursement of its defense costs.  Id. at ¶¶ 12-18, 21-22.  In the second cause of action, asserted against the Piras and Yin, Allstate seeks a declaration that it has no duty to indemnify the Piras or pay the judgment in the state court action.  Id. at ¶¶ 19-20.  In its complaint, Allstate contends that it has no duty to defend or indemnify the Piras in the state court case because "that action: (1) sought no damages caused by an 'occurrence'; (2) sought relief for injury that fell within Exclusion 1 of the Policies; (3) sought relief for the 'wilful' act of the insured under Insurance Code section 522, and/or (4) was not covered for other contractual or legal reasons."  Id. at ¶¶ 17, 20.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1      The clerk entered default in this case as to Andrew Pira on

2   September 9, 2011 and as to Richard Pira on October 14, 2011.

3   Docket Nos. 11, 18.

4      After being served with this lawsuit by publication, Yin

5   filed an answer and counter-complaint on February 2, 2012.  Docket

6   Nos. 32, 35, 36.  Allstate moved to dismiss the counter-complaint

7   on February 27, 2012.  Docket No. 37.

8      On March 19, 2012, Yin filed a first amended counter-

9   complaint (1ACC).  Docket No. 42.  In the 1ACC, Yin brings five

10  counter-claims against Allstate related only to the state court

11  judgment against Richard Pira: (1) for recovery of judgment

12  pursuant to California Insurance Code section 11580; (2) for

13  breach of contract; (3) for breach of the implied covenant of good

14  faith and fair dealing; (4) for injunctive relief and restitution

15  under the California Unfair Competition Law (UCL), California

16  Business and Professions Code §§ 17200, et seq.; and (5) for

17  declaratory relief.

18     Yin also alleged in his counter-claim that, on March 16,

19  2012, he had entered into an agreement with Andrew and Richard

20  Pira, in which he agreed not to execute against them the final

21  judgment that he obtained in the underlying action and would only

22  pursue Allstate for satisfaction of that judgment.  1ACC ¶ 15.  In

23  exchange, the Piras agreed not to appeal the judgment or pursue

24  any other defense of that action.  Id.

25     On April 3, 2012, Allstate moved to dismiss Yin's third and

26  fourth counter-claims and to strike or dismiss the fifth counter-

27  claim and the demand for punitive damages.  Docket No. 44.

28

1  Allstate did not challenge Yin's first two counter-claims for

2  recovery of judgment or breach of contract in that motion.

3      On June 4, 2012, the Court granted Allstate's motion to

4  dismiss and dismissed Yin's third, fourth and fifth claims and

5  struck his request for punitive damages.  Docket No. 57.

6      The parties subsequently stipulated to continue the briefing

7  schedule on their cross-motions for summary judgment, with Court

8  approval.  See Docket Nos. 59, 60, 62, 63.  Under the modified

9  schedule, Allstate was required to file its motion for summary

10 judgment by January 10, 2013 and Yin was required to file his

11 opposition and cross-motion by January 24, 2013.  Docket No. 63.

12     On January 10, 2013, Allstate filed its motion for summary

13 judgment.  Docket No. 77.

14     On January 25, 2013, Allstate filed its answer to Yin's 1ACC.

15 Docket No. 88.

16                      LEGAL STANDARD

17     Summary judgment is properly granted when no genuine and

18 disputed issues of material fact remain, and when, viewing the

19 evidence most favorably to the non-moving party, the movant is

20 clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

21 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

22 Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

23 1987).

24     The moving party bears the burden of showing that there is no

25 material factual dispute.  Therefore, the court must regard as

26 true the opposing party's evidence, if supported by affidavits or

27 other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg,

28 815 F.2d at 1289.  The court must draw all reasonable inferences

United States District Court
For the Northern District of California

10

in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

DISCUSSION

Allstate moves for summary judgment on the second cause of action of its complaint regarding the duty to indemnify and on Yin's 1ACC in its entirety.  Allstate argues that neither Andrew nor Richard was an "insured person" under either policy at the time of the shooting.  Allstate also contends that, even if Andrew were an insured person, there is no coverage for his liability because his liability did not arise out of an accident and his actions were willful and intentional.

In his motion, Yin seeks only a determination that Allstate is liable for the award against Richard.  Although he opposes Allstate's motion regarding coverage for the award against Andrew, he does not move for summary judgment regarding Andrew's coverage.

I.   Coverage for Richard Pira

Yin does not contend that Richard was an "insured person" under the Westgate policy.  Instead, he argues that Richard was entitled to coverage as an "insured person" under the Peabody policy.

United States District Court
For the Northern District of California

As stated above, the Peabody policy defines "insured person(s)" to mean Erlinda and, if a resident of her household, any relative and any dependent person in her care.  Davis Decl., Ex. A, AIC00031.  Richard would be covered only if he was a resident of Erlinda's household.  The policy does not provide a definition for the terms "resident" or "household."

Under California law, "[i]nterpretation of an insurance policy is a question of law and follows the general rules of contract interpretation."  TRB Invs., Inc. v. Fireman's Fund Ins. Co., 40 Cal. 4th 19, 27 (2006) (internal quotation marks and citation omitted).  The primary aim in interpreting an insurance contract is to give effect to "the mutual intention of the parties at the time of the contract."  Montrose Chemical Corp. v. Admiral Ins. Co., 10 Cal. 4th 645, 666 (1995).  "Such intent is to be inferred, if possible, solely from the written provisions of the contract."  Id.  "If the meaning a layperson would ascribe to the language of a contract of insurance is clear and unambiguous, a court will apply that meaning."  Id. at 666-67.  California courts also apply a rule of construction that "any ambiguities in an insurance policy must be interpreted against the insurer."  Cal-Farm Ins. Co. v. Boisseranc, 151 Cal. App. 2d 775, 780 (1957).  "This rule of construction extends to a determination of the question as to who is covered by a policy."  Id.; see also Continental Cas. Ins. v. Phoenix Constr. Co., 46 Cal. 2d 423, 427 (1956) ("If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against . . ., the amount of liability . . . or the person or persons

12

**United States District Court**
For the Northern District of California

1    protected . . ., the language will be understood in its most

2    inclusive sense, for the benefit of the insured.") (internal

3    citations omitted).

4         The parties dispute whether "resident" and "household" are

5    ambiguous in the policies.  When analyzing whether a person is a

6    resident of a particular household, California courts have

7    generally recognized that the terms "resident" and "household" are

8    not inherently ambiguous but do vary "according to the

9    circumstances and facts of the case."  <u>Utley v. Allstate Ins. Co.</u>,

10   19 Cal. App. 4th 815, 821 (1993); <u>see also</u> <u>Boisseranc</u>, 151 Cal.

11   App. 2d at 783 (collecting cases and stating, "These cases

12   illustrate that the interpretation of the terms involved is not

13   fixed but varies according to the circumstances of the case.");

14   <u>Safeco Ins. Co. v. Gibson</u>, 211 Cal. App. 3d 176, 181 (1989) ("the

15   common thread that runs through each of these cases is not whether

16   the terms 'residence' or 'member of the household' are themselves

17   inherently ambiguous, but whether, under the particular facts of

18   each of those cases, insurance coverage was extended or excluded

19   under the terms of the policy in question"); <u>Allstate Ins. Co. v.</u>

20   <u>Gassmann</u>, 2010 U.S. Dist. LEXIS 40567, at *14-15 (C.D. Cal.)

21   (collecting cases and holding that the "terms 'resident' and

22   'household' are not ambiguous"); <u>Kibbee v. Blue Ridge Ins. Co.</u>, 69

23   Cal. App. 4th 53, 61 (1999) ("Although the term 'resident' may not

24   have an absolute meaning . . ., it has a commonly accepted meaning

25   so that its use in the resident relative exclusion is not

26   inherently ambiguous.") (internal citation omitted); <u>but see</u>

27   <u>National Auto. & Cas. Ins. Co. v. Underwood</u>, 9 Cal. App. 4th 31,

28   40-42 (1992) (finding "resident" ambiguous because it was

United States District Court
For the Northern District of California

reasonably susceptible to three different constructions under the facts of that case).

The cases in which California courts have discussed these terms "can be roughly divided into cases involving policies excluding from coverage of the policies members of the insured's household, and those extending coverage to such persons." Boisseranc, 151 Cal. App. 2d at 782. "Both attempt to apply the rules of construction above discussed." Id. "As a result, in the extension cases the questioned terms are broadly interpreted, while in the exclusion cases the same terms are given a much more restricted interpretation." Id. "This is necessary because in both situations the courts favor an interpretation in favor of coverage." Id. Where a term appears in both the coverage and exclusion provisions, like the term "insured person" does here, and "there is nothing to show that its meaning changes with its location," courts "ascribe the same meaning to both provisions," because the "meaning cannot change according to the interests served in a particular controversy." Cal. Casualty Indem. Exch. v. Frerichs, 74 Cal. App. 4th 1446, 1452 (1999).

Yin argues that Richard lived with his mother, on and off throughout the course of his life, at the Westgate property and that, even when he moved to the Peabody house, they continued to constitute a single household, which "may have spanned two residences." Yin's Reply at 6. However, while it may be true that Richard was previously and is now again a part of his mother's household at the Westgate property, the evidence in the record is undisputed that, at the time of the shooting, Richard resided separately from his mother at the Peabody property. See

Yin's Opp. and Cross-Mot. at 4 ("At the time of the shooting,
March 17, 2005, Richard Pira owned and resided at the Peabody
address and spent some time at his mother's (Erlinda Ipac's) house
on Westgate.").  In his deposition in the present action, Richard
testified that, at the time of the shooting, the Peabody house was
his full-time residence and that he lived there alone.  Erlinda
testified that she and her boyfriend lived at the Westgate house
alone during that time and that, during the time Richard owned the
Peabody house, he never stayed the night at the Westgate house.
Barnes Decl. ¶ 3, Ex. B, 22:14-16, 40:13-17.  Erlinda described
the Peabody house as "his residence" at that time and said that
Richard never lived in her house while he owned the Peabody house.
Id. at 22:7-13.  This is not disputed.  At the hearing on the
instant motion, Yin's counsel acknowledged that Richard lived only
at the Peabody house at the time of the incident and stated that
he did not contend that Richard was a resident of the Westgate
house at that time.

     At the hearing, Yin also argued that Erlinda's household, for
the purposes of the Peabody policy, was the Peabody property and
not the Westgate property.  Yin contends that to be a resident of
the "insured premises," that is, the premises listed on the
declarations page, means to be a resident of the named insured's
"household."  However, Yin cites no authority for the proposition
that the named insured's "household" means the physical location
identified as the "insured premises" on the declarations page.  In
interpreting the term "household" in insurance contracts,
California courts have recognized that, although the term
"household" may have different meanings under different

circumstances, "there are at least two aspects to a household"

that must be fulfilled: first, a household "includes family

members and others, whether related or not, who live together

under one head," and second, "the persons live together, be it in

the same house or under one roof or at least within one

curtilage." Jacobs v. Fire Ins. Exch., 227 Cal. App. 3d 584, 592

(1991) (adopting the holding of Island v. Fireman's Fund Indemnity

Co., 30 Cal. 2d 541, 547-48 (1947)) (internal quotation marks

omitted); see also Island, 30 Cal.2d at 547 (recognizing that one

definition "of the word 'household' given in Webster's New

International Dictionary is, 'Those who dwell under the same roof

and compose a family; a domestic establishment'"). The Ninth

Circuit has recognized, in an unpublished opinion, that the

"generally adopted definition of household" is the one set forth

in Jacobs. Kohlhase v. Safeco Ins. Co. of Am., 484 Fed. App'x.

106, 107 (9th Cir. 2012).

Under this general understanding of household, Erlinda did

not maintain a household at the Peabody property; she testified

that she only visited there once and that she lived instead at the

Westgate house. Barnes Decl. ¶ 3, Ex. B, 13:18-20, 21:16-17.

In his arguments, Yin focuses on California cases that

consider whether minor children of divorced parents are

"residents" of the "household" of one of their parents. In

Boisseranc, the court considered whether a minor child, who was in

his mother's physical custody under the terms of his parents'

divorce decree, was a resident of his father's household and

thereby covered by his father's insurance policy. 151 Cal. App.

2d at 784-85. Despite the terms of the divorce decree, the child

16

spent three-quarters of his time at his father's home, although he
was staying at his mother's home at the time of the relevant
incident.  Id.  In view of the rules of construction applicable to
insurance policies, the court found that the minor child was a
resident of his father's household for the purposes of insurance
coverage.  Id.

In Underwood, another case discussed by Yin, the court
considered whether the minor children of a divorced couple were
residents of their mother's household, in order to determine
whether they were subject to an exclusion in an insurance policy
held by their mother.  The children spent most of their time
living with their father but, at the time of the relevant
accident, were residing at their mother's home.  9 Cal. App. 4th
at 40.  The court found that there were three reasonable
interpretations of the word "resident" in the policy--that the
children were residents of their mother's household, that the
children were residents of their father's household or that the
children had dual residences, with both parents.  Id.  Under the
principle that a provision of an insurance policy that is
susceptible to two reasonable constructions should be construed
most strongly in favor of the policy holder, the court held that
the children were not residents of the mother's household at the
time of the accident.  Id. at 41.

However, although these cases illustrate that the policy
terms are generally construed broadly to extend coverage and that
a person may be a resident of multiple households or may be a
resident of a household at which he or she does not live full-time
or permanently, they also note that courts are required to

United States District Court
For the Northern District of California

17

United States District Court
For the Northern District of California

"examine the particular circumstances of the case" before them in this process and assess whether the disputed terms are susceptible to multiple "reasonable constructions." Id. at 40.  No reasonable construction of the word "household" supports that Erlinda could maintain a household at the Peabody house in which she has never lived and has only visited once, which she categorized as Richard's residence, not hers, or with Richard, with whom she did not then live.  This word cannot be reasonably construed so broadly as to ignore the minimum components set forth in Jacobs.

This result is consistent with that reached by a panel of judges on the Ninth Circuit Court of Appeals in the non-precedential decision in Kohlhase.  In that case, the Ninth Circuit applied the Jacobs definition of "household" in evaluating a similar situation.  There, "the policy insuring the Esplanade home provided liability coverage to the named insured, Judith Thomas, and to family members that were 'residents of your household.'"  484 Fed. App'x. at 107.  The district court granted summary judgment in favor of the insurance company "finding that 'household' unambiguously applied to Thomas' residence, 179 North Garfield Place, in Monrovia, California, thereby precluding from liability coverage Pittman, Thomas' daughter, who resided at the Esplanade home."  Id.  The Ninth Circuit affirmed, holding, "Under California's definition of household Pittman is plainly not a resident of Thomas' household."  Id. at 108.  It stated that "the record demonstrates that the activities of Pittman and Thomas were not those of one household, as Thomas resided miles away, maintained no personal room at the Esplanade home, and visited infrequently and only after giving notice to Pittman of her

18

intended arrival" and "Thomas herself referred to the Esplanade home as Pittman's separate household." Id. The court also noted that the policy itself showed that Thomas did not consider the Esplanade home to be her household because she "crafted the insurance policy to protect her investment in the Esplanade home by including rental insurance coverage, but excluded personal property and additional living expense coverage." Id. Although Yin argues that the Peabody policy was not so crafted here, that was only one factor that the court considered in its analysis.

Contrary to Yin's arguments, Allstate has not judicially admitted his allegations regarding coverage for Richard and is not estopped from denying that he is an insured because it disclosed this argument too late. Although its answer was untimely, Allstate did file a response to his counter-claims denying the allegations made therein. Therefore, there is no basis to apply Federal Rule of Civil Procedure 8(b)(6), which provides, "An allegation--other than one relating to the amount of damages--is admitted if a responsive pleading is required and the allegation is not denied." Further, in its reservation of rights letter, Allstate stated that it had been unable to determine who was living where or with whom at the time of the shooting and that it reserved the right to disclaim coverage for anyone who it found ultimately did not qualify as an insured person. This clearly informed the Piras that Allstate might raise this defense. Although Allstate did not specifically state in its complaint that Richard was not an insured person because he was not a resident of Erlinda's household, it did allege that the underlying action "was not covered for other contractual or legal reasons," in addition

to identifying three particular reasons.  Compl. ¶¶ 17, 20.  This claim was made more clear in discovery by at least July 25, 2012, when Allstate's counsel wrote Yin's attorney,

> Since we have depositions coming up, I wanted to make sure that we are on the same page regarding the coverage issues as they relate to Andrew and Richard.  As alleged in the declaratory relief complaint, Erlinda Ipac is the named insured under both Allstate policies.  Since the policies cover the named insured and relatives who reside in her household, the depositions will focus on the residency of Erlinda, Richard and Andrew.

Barnes Reply Decl., Ex. B.  Finally, Yin's argument that Allstate cannot make legal arguments about the meaning of the phrase "resident of your household" that it did not identify in its discovery responses is unavailing.  First, Yin made this argument for the first time in his reply, even though Allstate had raised arguments about the meaning of this phrase in its opening brief. Second, Allstate objected to Yin's interrogatories, stating that they sought a legal analysis and information protected from disclosure by the attorney-client privilege or work product doctrine.  Vannucci Reply Decl., Ex. 2.  In essence, Yin asks here that Allstate be precluded from making its legal arguments as a sanction for refusing to disclose them during discovery.  Yin did not seek to compel further responses from Allstate or to challenge its objections pursuant to Rule 37(a).  Thus, Allstate has not been ordered to provide further responses, and sanctions, such as those under Rule 37(b)(2) for failure to comply with a discovery order, are not warranted.

Accordingly, the Court finds that there is no material dispute of fact that Richard Pira was not an "insured person" under the policies at the time of the incident.  The Court

United States District Court
For the Northern District of California

therefore GRANTS Allstate's motion for summary judgment that it has no duty to indemnify Richard and DENIES Yin's cross-motion.

II.   Coverage for Andrew Pira

Allstate argues that there is no coverage under either policy for Andrew Pira for a number of reasons, including that the policies cover "occurrences," which are defined as "accidents" and the shooting of Yin was not an accident, that the judgment against Andrew was for an intentional act and thus subject to an exclusion in the policy, and that the judgment against Andrew was not insurable pursuant to California Insurance Code section 533 because it was caused by Andrew's willful act.  Allstate also contends that Andrew was not an insured person under either policy.

Yin asserts that Andrew was an insured person under the Westgate policy because he lived there at the time of the shooting.  He "concedes that some of Andrew Pira's alleged conduct is likely excluded by the intentional acts exclusion" but argues that some portion of the award was for negligence rather than an intentional act.  Yin's Opp. and Cross-Mot. at 17.  He also contends that Allstate has not met its burden to show what portion of the jury's award against Andrew was to compensate for claims that fell into the intentional acts exclusion and what portion was for those that did not, and thus that Allstate cannot get summary judgment as to any part of that award.  He does not make any argument as to how the claims against Andrew were the result of an accident or how the state court judgment was not caused by a willful act.

Regardless of where Andrew lived at the time of the shooting, there is no dispute of material fact that the events underlying the state court judgment were not an accident and thus there was no covered occurrence under the policy.  Here, the requirement that the events be an "occurrence" is part of the coverage terms and not part of an exclusion.  "Insurance policies are written in two parts: an insuring agreement which defines the type of risks being covered, and exclusions, which remove coverage for certain risks which are initially within the insuring clause." Rosen v. Nations Title Ins. Co., 56 Cal. App. 4th 1489, 1497 (1997).  The insured bears the burden of showing that claims fall within the scope of coverage, and the insurer bears the burden of proving that otherwise covered claims fall within an exclusion. Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 16 (1995).  Further, "exclusionary clauses are interpreted narrowly, whereas clauses identifying coverage are interpreted broadly." Garvey v. State Farm Fire & Casualty Co., 48 Cal. 3d 395, 406 (1989).

"In the context of liability insurance, an accident is an unexpected, unforeseen, or undesigned happening or consequence from either a known or an unknown cause." Delgado v. Interinsurance Exch. of Auto. Club of S. Cal., 47 Cal. 4th 302, 308 (2009) (internal quotation marks and citations omitted). "This common law construction of the term 'accident' becomes part of the policy and precludes any assertion that the term is ambiguous." Id. (internal quotation marks and citations omitted). The Delgado court noted that "an injury-producing event is not an 'accident' within the policy's coverage language when all of the

acts, the manner in which they were done, and the objective

accomplished occurred as intended by the actor." Id. at 311-12.

In Interinsurance Exch. v. Flores, 45 Cal. App. 4th 661

(1996), the California Court of Appeal found that no coverage was

provided under similar facts.  In that case, Eric Michael Sanders

was punched by an unknown person and Sanders told Roger Perez of

the incident.  Id. at 667.  Perez suggested they return to the

scene and seek retribution and told Sanders he was armed with a

handgun.  Id.  Sanders drove Perez and others to the location,

where, from the vehicle, Perez intentionally shot and injured

David Flores.  Id.  Flores, with and through his guardian ad

litem, sued Sanders for conspiracy, battery and negligence.  Id.

The Court of Appeal upheld the trial court's finding that the

Floreses failed to meet their burden to shown that Sanders's

conduct was accidental within the meaning of the insurance policy.

Id. at 671.  The court explained,

> It was planned.  Sanders knew Perez was armed with a
> deadly weapon.  He drove Perez to the place where he
> thought they might find the person who had punched him.
> Sanders knew that someone was likely to be shot.
> Sanders therefore intended and expected injury to result
> from his acts.

Id.  That there was a finding of negligence in addition to

intentional battery did not affect the outcome.

Similarly, here, Yin has not disputed that the record shows

that Andrew planned to have Yin shot to escape paying his gambling

debt and that he left him in a field to die.  Although he argues

that "[l]eaving an injured person in an abandoned field far from

home when one has assumed a duty to that person by driving him out

there is . . . negligence," not battery, Yin's Reply at 10, this

act also is not an accident within the definition set forth in

Delgado.

Because Yin has not raised a material dispute of fact that the judgment against Andrew arose out of a covered occurrence, the Court GRANTS Allstate's motion for summary judgment as to the duty to indemnify Andrew.

CONCLUSION

For the reasons set forth above, the Court GRANTS Allstate's motion for summary judgment (Docket No. 77) and DENIES Yin's cross-motion for summary judgment (Docket No. 91).

Within twenty-eight days of the date of this Order, Allstate shall move for default judgment against Andrew and Richard Pira or dismiss its claims against them and move for entry of judgment pursuant to Federal Rule of Civil Procedure 58.

IT IS SO ORDERED.

Dated: 4/19/2013

CLAUDIA WILKEN
United States District Judge